**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JEFFREY KAPCHE, |
| Plaintiff, |
| v. |
| MICHAEL MUKASEY, Attorney General of the United States, |
| Defendant. |

Civil Action No. 1:07-cv-02093

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR A SUPPLEMENTAL PROTECTIVE ORDER**

**INTRODUCTION**

Plaintiff Jeffrey Kapche has propounded broad discovery requests seeking the identity of and detailed medical information, including any "problems" caused by "a medical condition," for current or former Federal Bureau of Investigation ("FBI") Special Agents with diabetes,[1] as well as Special Agents or applicants who were terminated or denied employment for failure to meet any of the FBI's "medical requirements."[2]  Through this motion, the FBI seeks a protective order on the ground that the privacy infringement such disclosure would entail for agents and applicants, who are not parties to this action and who have a statutory right to keep their medical records confidential, substantially outweighs any conceivable probative value of the medical records and information sought by Plaintiff.

Plaintiff responds that these records are essential to evaluate the validity of Defendant's proffered "business necessity" and "direct threat" defenses.  In Kapche's view, "[c]ommon sense

---

[1]  Interrogatory Nos. 4, 5 and 6; Request for Production No. 7.

[2]  Interrogatory No. 11; Request for Production No. 17.

dictates that the FBI must produce information about those with diabetes who actually serve as FBI special agents, because it is that evidence that bears upon [the FBI's proffered affirmative] defenses."  Pl. Opp. at 6.

As we explain below, however, Plaintiff's asserted need to obtain detailed medical information regarding individuals who are not parties to this action proceeds from a profound misunderstanding regarding the legal standards that govern both the "business necessity" and the "direct threat" defenses.[3]  The business necessity defense applies where an employer demonstrates that a "qualification standard," such as the prophylactic medical qualification standard at issue here, is job-related and consistent with business necessity (*i.e.*, that the standard furthers the FBI's legitimate goal of ensuring safe, efficient, and successful job performance of its Special Agents).  42 U.S.C. § 12113(a).  The validity of the FBI's medical standards under section 12113(a) depends not upon whether the FBI has ever encountered a "performance problem" in the past with an employee with diabetes, but instead upon whether there is objective medical evidence supporting the particular medical standards adopted by the FBI.  Similarly, it is established that the "direct threat" defense must rest upon an *individualized* assessment of *Plaintiff's* ability to safely perform the essential functions of a FBI Special Agent and whether that assessment constitutes a reasonable medical judgment based on the most current medical knowledge and best available objective evidence.

_____

[3]  Moreover, as the case Plaintiff cites make clear, *see* Pl. Opp. at 2, the "business necessity" and "direct threat" defenses, require separate, materially different legal analyses.  *See E.E.O.C. v. Exxon*, 203 F.3d 871, 874 (5th Cir. 2000) ("Direct threat focuses on the individual employee, examining the specific risk posed by the employee's disability.  In contrast, business necessity addresses whether the qualification standard can be justified as an across-the-board requirement.") (internal citations omitted).  Notwithstanding this fact, Kapche conflates the two defenses throughout his response to Defendant's motion.

Thus, contrary to the assertions in Plaintiff's brief, neither defense hinges on what medical conditions or any resulting "problems" *other* FBI employees (or applicants for employment) may or may not have experienced. Accordingly, neither party can support or oppose these defenses by introducing the medical records of third parties. As such, there is no colorable basis for Plaintiff's attempt to obtain access to the private medical records of other individuals particularly where, as here, the statute upon which Plaintiff's claim is based mandates that such records remain confidential.

## ARGUMENT

### I. THE MEDICAL RECORDS SOUGHT BY PLAINTIFF ARE NOT RELEVANT TO THE FBI'S BUSINESS NECESSITY DEFENSE

Section 501(g) of the Rehabilitation Act, 29 U.S.C. § 791(g), provides that, with respect to a "nonaffirmative action employment discrimination" complaint, the standards to be used to determine whether section 501 has been violated are the same as the standards applied under Title I of the Americans With Disabilities Act of 1990 ("ADA") (42 U.S.C. § 12111 *et seq.*). The ADA, in turn, provides that: "It may be a defense to a charge of discrimination under this chapter that an alleged application of *qualification standards*, tests, or selection criteria that screen out or tend to screen or otherwise deny a job or benefit to an individual with a disability has been shown to be *job-related* and *consistent with business necessity*, and such performance cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113(a) (emphasis added) (hereinafter "business necessity defense"). The EEOC's implementing regulation defines the term "qualification standard" to mean "the personal and professional attributes, including the skill, experience, educational, physical, medical, safety, and other requirements . . . which an

-3-

individual must meet in order to be eligible for the position held or desired." 29 C.F.R.

1630.2(q).  In accordance with these provisions, Defendant avers in its Amended Answer that

"[t]he medical standards utilized by the FBI in processing Plaintiff's application for employment

as a Special Agent are job related and consistent with business necessity."  Defendant's

Amended Answer to Plaintiff's First Amended Complaint ("Amended Answer") at 1 (Third

Defense).

      As the text of the ADA reflects, the validity of a qualification standard depends upon

whether it is "job-related" and "consistent with business necessity."  42 U.S.C. § 12113(a).  A

qualification standard is "consistent with business necessity" if it "serves, in a significant way,

the legitimate employment goals of the employer."  *Wards Cove Packing Co. v. Atonio*, 490 U.S.

642, 659 (1989); *Bates v. United Parcel Service*, 511 F.3d 974, 996 (9th Cir. 2007) (en banc)

("To show that the disputed qualification standard is 'consistent with business necessity,' the

employer must show that it 'substantially promote[s]' the business's needs.").  Put another way, a

qualification standard is "consistent with business necessity" if it substantially promotes safe,

efficient or successful job performance.  *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977).

      Here, the FBI has adopted a medical qualification standard which is designed to ensure

that applicants can safely perform the essential functions of the Special Agent position by

requiring, as a precondition for employment, that an applicant with Type I diabetes provide

medical evidence demonstrating that the applicant's diabetes is adequately controlled.  To make

this determination, the FBI considers the method used by the applicant to control his or her blood

glucose levels and requires the applicant to submit daily logs documenting that such control has

been effective over a period of time.  The validity of this qualification standard depends on

whether sound medical evidence supports the FBI's conclusion (i) that adequate control of diabetes is "necessary to safe and efficient job performance," *Dothard v. Rawlinson*, 433 U.S. 321, 331 n.14 (1977); (ii) that the method used by insulin-dependent applicants to ensure diabetes control must account for the constantly changing and unpredictable nature of the Special Agent job; and (iii) that daily logs over a substantial period of time are needed to document such control.

Notwithstanding Plaintiff's claims to the contrary,[4] Defendant's business necessity defense is in no way dependent upon whether the FBI has employed a particular Special Agent with diabetes in the past and, if so, whether that particular individual could or could not perform the essential functions of his or her job.  The FBI is free to adopt prophylactic standards to ensure worker safety *before* it encounters problems, as it has done with Type I diabetes.  Nothing in the Rehabilitation Act requires that an employer defer adopting safety-related qualification standards until someone has been killed or injured as a result of a medical impairment.[5]  *Smith v. City of Des Moines*, 99 F.3d 1466, 1473 (8th Cir. 1996) ("[T]he law does not require the city to put the lives of Smith and his fellow firefighters at risk by taking the chance that he is fit for duty when

---

[4]  *See* Pl. Opp. at 6 ("If it turns out that information [about performance-related problems of Special Agents with diabetes] is so difficult to gather, how then could the agency have come to the conclusion that it was necessary to have a qualification standard that bans those who manage diabetes with insulin injections?").

[5]  Apart from relying on the mistaken premise that the FBI could not enact medical qualification standards in advance of any performance-related problems, Plaintiff's rhetorical question recounted above does not even comprehend the full measure of the qualification standard.  Kapche omits that FBI qualification standards require applicants with Type I diabetes to furnish several months of daily logs showing sufficient blood glucose management —which he undisputedly failed to do—and almost certainly could not have done before his 37th birthday (the cutoff date for entry on duty as a Special Agent under FBI regulations).

solid scientific studies indicate that persons with test results similar to his are not"); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1120-21 (11th Cir. 1993) ("The mere absence of unfortunate incidents is not sufficient to establish [safety]; otherwise safety measures could be instituted only once accidents occurred rather than in order to avert accidents.").

Accordingly, the validity of the FBI's medical standard depends on whether it is supported by objective medical evidence, and not on whether anecdotal data in the medical files of the small fraction of FBI Special Agents who have diabetes supports or fails to provide support for the standard. *Fitzpatrick,* 2 F.3d at 1119 n.6 ("In order to establish a safety based business necessity defense, employers have been required to present convincing expert testimony demonstrating that a challenged practice is in fact required to protect employees or third parties from documented hazards."); *see also Exxon*, 203 F.3d at 874 (5th Cir. 2000) ("[T]he strength of the [business necessity defense] turns on whether the employer can justify the safety standard as a general rule.").[6]

Plaintiff's argument to the contrary is based on the mistaken premise that such prophylactic qualification standards are impermissible. Here again, Plaintiff's argument consists of nothing more than self-serving assertions. He cites not a single case for the proposition that

_____

[6] This cuts both ways. Just as Kapche cannot challenge a medically sound qualification standard regarding diabetes control simply by demonstrating that FBI's policies have avoided any lapse in safety, the FBI cannot use isolated instances of "performance problems" to justify a qualification standard that is not supported by sound medical evidence. It is precisely for this reason that the FBI does not intend to proffer evidence about diabetes-related, job performance problems of Special Agents to justify the medical standards used to process Plaintiff's application for employment. Because the government cannot use this information as either a sword (to show that Kapche had not sufficiently controlled his diabetes) or a shield (to buttress the medical basis of any of the FBI's qualification standards in issue), Kapche cannot demonstrate any legitimate need to obtain access to the medical records of individuals who are not parties to this case.

the medical evidence on which an employer bases a qualification standard must come from that employer's own past experience with its own employees, and for good reason. Such a requirement would confound common sense, as an employer would have to wait until employees' job performance suffered due to medical reasons before enacting criteria to ensure that an applicant can perform the job "safe[ly], efficient[ly and] successful[ly]." *Dothard,* 433 U.S. at 331 n.14. With respect to FBI Special Agents, this would literally amount to a requirement that the FBI first endanger the health and safety of both its own employees and members of the public before it could impose a safety standard design to minimize a safety risk.

That cannot be and is not the law. As we explained above, the law does not require that the FBI place the lives of its Special Agents and members of the public at risk by taking the chance that Plaintiff is fit for duty. *Smith*, 99 F.3d at 1471. Nor can Plaintiff demonstrate that the FBI's medical standards are unnecessary merely by establishing the "absence of unfortunate incidents." *Fitzpatrick*, 2 F.3d at 1120-1121.[7] The proper avenue for Plaintiff to challenge the qualification standards in issue, if he so chooses, is to offer expert testimony stating that the qualification standards on which the FBI relied to revoke Kapche's conditional offer are not based on objective medical evidence. *See id.* at 1121 (suggesting that expert testimony is the

---

[7] Prior to 1999, the FBI did not hire any applicant with Type I diabetes as a Special Agent. In response to evolving standards of diabetes care and management, the FBI modified its policy with respect to insulin-dependent diabetics, permitting them to serve as Special Agents if they could demonstrate sufficient control of their diabetes over time. If Plaintiff is correct, and prophylactic qualification standards are impermissible, the FBI would have faced the Hobson's choice of continuing to bar all diabetics, and potentially run afoul of the Rehabilitation Act, or to allow all diabetics to enter on duty without regard to whether they had demonstrated sufficient control of their diabetes unless and until a sufficient number of diabetes-related performance problems were documented to justify such a policy. As we explain in the text, nothing in the Rehabilitation Act requires an employer to endanger its workforce before it can lawfully adopt an appropriate safety standard.

appropriate manner to challenge a safety-based qualification standard).

The issue before the Court is whether the requirement that FBI Special Agent applicants demonstrate sufficient control of their diabetes as a precondition for hiring substantially promotes the FBI's objective of ensuring safe, efficient and successful job performance. Resolution of this issue merely requires that the Court determine whether there is a sound medical basis for the FBI's conclusion that such a requirement is necessary. It does not require that the Court conduct a wide-ranging and intrusive inquiry into the medical condition of each and every individual who has ever served as a Special Agent or who has even applied for employment as a Special Agent.

For all of these reasons, Plaintiff has failed to demonstrate that the medical records he seeks have any probative value with respect to Defendant's business necessity defense.

## II.   THE MEDICAL RECORDS OF THIRD PARTY EMPLOYEES ARE NOT RELEVANT TO THE DIRECT THREAT DEFENSE

The medical records sought by Plaintiff here also have no probative value at all with respect to Defendant's "direct threat" defense. The ADA expressly provides that "[t]he term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health and safety of other individuals in the workplace." 42 U.S.C. § 12113(b) ("direct threat" defense). "By regulation, the EEOC carries the defense one step further, in allowing an employer to screen out a potential worker with a disability not only for risks that he would pose for others in the workplace but for risks on the job to his own health or safety as well." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78-79 (2002) (citing 29 C.F.R. § 1630.15(b)(2)). Consistent with these provisions, Defendant avers in the Fourth Defense of his

Amended Answer that: "Allowing plaintiff to perform the essential functions of a Special Agent would pose a direct threat to the health and safety of Plaintiff, other FBI employees, and members of the public."

As the D.C. Circuit has explained: "The direct threat defense must be based on a 'reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an '*expressly individualized assessment* of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Taylor v. Rice*, 451 F.3d 898, 906 (D.C. Cir. 2006) (quoting in part *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. at 86 (emphasis added)). A health care professional's risk assessment is to be based on the "objective, scientific information available to him and others in his profession." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998); *accord*, *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 569 (1999) (direct threat criterion requires "an individualized assessment of the individual's present ability to safely perform the essential functions of the job based on medical or other objective evidence") (internal citations omitted).

As these cases make clear, the FBI's direct threat defense depends upon the validity of the FBI's "individualized assessment" of whether *Plaintiff* can safely perform the essential functions of an FBI Special Agent. *Taylor v. Rice*, 451 F.3d at 906; *Echazabal*, 536 U.S. at 86. The reasonableness of the FBI's medical judgment is to be based on the "objective, scientific information" available to the FBI's doctors and other medical professionals at the time the assessment was made. *Bragdon*, 524 U.S. at 649; *Albertson's*, 527 U.S. at 569. If the FBI demonstrates that its assessment of Plaintiff's ability to safely perform the functions of a Special

Agent is a "reasonable medical judgment that relies upon the most current medical knowledge," *Taylor*, 451 F.3d at 906, it is lawful under the Rehabilitation Act regardless of whether the FBI has ever hired a Special Agent with diabetes and regardless of whether that agent experienced any type of performance problem. Conversely, the fact that the FBI may have experienced a performance problem with some other agent who happened to have diabetes does not mean that the FBI's assessment of *Plaintiff's* medical condition constitutes a reasonable medical judgment.

In sum, there is no basis for Plaintiff's contention that he needs the medical records of *other* FBI Special Agents and applicants in order to challenge the validity of the direct threat defense as applied to him. Indeed, the very cases Plaintiff cites undermine his argument about why he needs these confidential medical records. *See* Pl. Opp. at 3 (The "direct threat defense must be based upon . . . an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job. . . .") (quoting *Taylor*, 451 F.3d at 906). Because the direct threat analysis must be performed on a case-by-case basis, the unique medical problems of *other* FBI employees and applicants simply have no bearing on whether Kapche, with his unique medical situation, would pose a direct threat to himself or others if he were to perform the essential functions of an FBI Special Agent.

Nor are the medical records in issue relevant to a determination of whether any accommodation the FBI might have granted Kapche is "reasonable." As the FBI explained in its opening brief, case law makes clear that Kapche — as a mere applicant — is not similarly situated to Special Agents who have already entered on duty with the FBI. *See* Def. Br. at 4-5 (citing *Barth v. Gelb*, 2 F.3d 1180, 1189 (D.C. Cir. 1993) (rejecting argument that agency had obligation to accommodate applicants and employees to same degree, as that argument

"overlook[s] the benefits that agencies derive from accommodating the special needs of existing employees, which they do not gain from serving those of applicants"). Plaintiff cites no authority to the contrary.

Instead, he argues that, as an accommodation case, *Barth* has no relevance to this case because "affirmative defenses are involved" here. Pl. Opp. at 5. Yet Plaintiff cites no authority to support his assertion that accommodation has nothing to do with affirmative defenses. This absence of authority is unsurprising because both the ADA itself and the case law construing the ADA make clear that the availability of a reasonable accommodation *is* directly relevant to both the business necessity and the direct threat defenses. *See* 42 U.S.C. § 12113(a) (business necessity defense applies where qualification standard is "shown to be job-related and consistent with business necessity, and *such performance cannot be accomplished by reasonable accommodation*"); *Taylor*, 451 F.3d at 906 (D.C. Cir. 2006) ("'Direct threat' in this context means a significant risk of substantial harm to the health or safety of the individual *that cannot be eliminated or reduced by reasonable accommodation.*") (emphasis added and internal quotations omitted).[8] In other words, even accepting Plaintiff's characterization of *Barth* as "an accommodation case," Pl. Opp. at 5, the scope of the FBI's obligation to accommodate Plaintiff is directly pertinent to both the business necessity defense and the direct threat defense. Moreover, as *Barth* makes clear, the FBI is not obliged to accommodate Kapche, as a mere applicant, merely because the FBI has accommodated trained and experienced Special Agents who are already employed by the FBI.

Even if the FBI were required to accommodate applicants and agents to the same degree

_____

[8] *See also Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999).

(which it is not), it would not follow from this that past accommodations the FBI granted to some Special Agents created a mandatory legal duty to provide a similar accommodation to Kapche or any other applicant. As the Seventh Circuit has held, "if an employer bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation." *Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001) (internal quotations omitted).

In any case, Plaintiff remains free to take discovery to determine that the FBI accommodates existing Special Agents with diabetes in various ways. Indeed, in response to Plaintiff's Interrogatories, the FBI has already disclosed information to Kapche regarding accommodations it has granted to Special Agents with Type I diabetes. However, Plaintiff does not need to obtain access to the private medical records of agents or other applicants to obtain information regarding the types of accommodations granted to other individuals, particularly in light of the FBI's acknowledgment (i) that it accommodates existing agents with diabetes; and (ii) that it accommodates existing agents with diabetes to a greater extent than applicants. For all of these reasons, Plaintiff has failed to show that the medical records he seeks have any probative value—let alone sufficient probative value to override the substantial privacy interests of non-party employees and non-party applicants in keeping their personal medical records confidential.

## III.    THE PRIVACY HARM THAT WOULD RESULT TO THIRD PARTIES IS BOTH SUBSTANTIAL AND UNDISPUTED.

Plaintiff essentially concedes that disclosing the private, personal medical information of FBI Special Agents and applicants would cause a substantial invasion of privacy. Kapche downplays this risk, maintaining that he has "absolutely no interest in embarrassing anyone," as

if his subjective intent is somehow relevant to the Rule 26 calculus. And while Kapche

maintains that he "could live with" a redacted list of FBI Special Agents who have diabetes, Pl.

Opp. at 7, it is clear that he seeks unredacted records so that he could depose these agents if he

sees fit. *See* Pl. Opp. at 8 ("[T]hese agents may need to be deposed. That is the reality."). What

seems to elude Kapche is that the very disclosure of the medical condition and related problems

— let alone being asked questions about these conditions and problems under oath — is

embarrassing in and of itself.[9] While the fact that the disclosure would be limited to Plaintiff,

counsel for the parties, their staff, consultants and experts, and any court reporters transcribing

any resulting deposition might limit the harm, it does not excuse it.

Plaintiff argues that the FBI is seeking to have it both ways because it is willing to

identify agents by name to show where agents have traveled, but is unwilling to identify agents

by name when it comes to medical problems. Pl. Opp. at 7. Surely Plaintiff can discern the

difference in the degree of intrusiveness into the privacy interests of individuals who are not

parties to this case between disclosing where one has traveled for work (hardly something that

could cause humiliation or anger) and disclosing intensely personal information regarding an

individual's medical impairments.

Moreover, Plaintiff's claim to discovery, if sustained, would contradict both the letter and

---

[9] Plaintiff argues that "giv[ing] a false name for [agents who have had medically-related performance problems] would address the privacy interests of the individuals [who would be deposed.]" Pl. Opp. at 8. This assertion lacks a basis in law or common sense. Plaintiff offers no citation whatsoever that testifying under a redacted name is sufficient to obviate third party privacy concerns. Kapche simply asserts his conclusion, and an obviously incorrect one at that. The veneer of privacy created by name redaction would be shattered when one is required to answer questions face-to-face, under oath about a medical condition and any "performance problems" resulting from that condition.

spirit of the Rehabilitation Act.  Plaintiff would have the Court order disclosure of intensely personal medical information based upon arguments that could be used to justify compelling the release of records regarding virtually any medical condition, including not only diabetes but also other medical conditions (*e.g.*, which agents or applicants are HIV-positive or have some form of psychological disorder that would preclude an applicant from obtaining employment), and which agents have experienced any related "performance problems."  Under Plaintiff's theory, then, every individual who submits to a medical examination by his or her employer would essentially be deprived of the right to determine whether and to whom that information should be disclosed because such information would be subject to disclosure whenever any other individual employee or applicant brings a lawsuit under the ADA or the Rehabilitation Act.  Imposition of such a mandatory disclosure requirement on individuals with disabilities would directly conflict with the confidentiality requirements of both the ADA and the Rehabilitation Act.  *See* 42 U.S.C. 12112(c)(3) and (c)(4), 29 U.S.C. § 791(g).

Enforcement of this type of intrusive demand to inquire into the details of medical impairments of non-party employees and non-party applicants would injure the very individuals that the Rehabilitation Act and the ADA were designed to protect.  Indeed, under Plaintiff's theory, individuals with disabilities would be the *only* individuals who would forfeit their right to medical privacy when they apply for a job because only their medical information would be responsive to the sort of discovery requests at issue here.  It would be deeply ironic if the Rehabilitation Act and the ADA — both of which seek to ensure the confidentiality of employee medical conditions — were interpreted such that the medical privacy of untold numbers of individuals would be threatened any time an employer asserted a medically-based affirmative

defense.

Federal Rule of Civil Procedure 26(c) specifically grants the Court discretion, for good cause, to issue a protective order "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters" to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ."  Given the negligible probative value of the medical records sought by Plaintiff, and the undisputed privacy interests of non-party employees and applicants in maintaining the confidentiality of their medical records, such an order is clearly warranted here.[10]

---

[10]  The FBI also reiterates that it also raised burdensomeness objections to some of the interrogatories and document requests that are the subject of this protective order motion.  *See* Def. Br. at 5, n.5.  While Plaintiff's Opposition suggests that the FBI has somehow waived these burdensomeness objections by focusing its protective order motion on the irrelevance of the requested information, as well as the potential harm to privacy interests that would result from disclosure, no such waiver has occurred.  The FBI's motion focuses on the threshold question of whether it is required to produce medical information about third party employees and applicants, as requested by Plaintiff.  Plaintiff has not yet moved to compel the production of responses and documents.  Accordingly, at this point, the FBI does not know what, if any, of the challenged discovery requests to which it will be required to respond.  In the event that the Court does not grant the protective order in its entirety, the FBI will meet and confer with Plaintiff on what, if anything, must be produced.

## CONCLUSION

For the aforementioned reasons, Defendant respectfully requests that the Court grant a

protective order barring:

(i) the disclosure of the identity of FBI agents and applicants with medical
conditions;

(ii) the disclosure of the medical records for those FBI agents and applicants; and

(iii) prohibiting further discovery regarding the medical conditions of these agents
or applicants.

Dated: April 14, 2008                    Respectfully submitted,

                                         JEFFREY BUCHOLTZ
                                         Acting Assistant Attorney General

                                         JOSEPH W. LOBUE (D.C. Bar No. 293514)
                                         Assistant Branch Director,
                                         Federal Programs Branch

                                         DIANE KELLEHER
                                         Senior Counsel, Federal Programs Branch

                                         _____/s/_____
                                         C. LEE REEVES
                                         Department of Justice, Federal Programs Branch
                                         20 Massachusetts Avenue, N.W., Room 7109
                                         Washington, D.C.  20530
                                         Tel: 202-514-4805
                                         Fax: 202-616-8470
                                         *Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JEFFREY KAPCHE, | |
| Plaintiff, | |
| v. | Civil Action No. 1:07-cv-02093 |
| MICHAEL MUKASEY, Attorney General of the United States, | |
| Defendant. | |

**[Proposed] ORDER**

Upon consideration of Defendant's Motion for a Protective Order, it is hereby

ORDERED that the motion is GRANTED.

Dated: _____.

_____
UNITED STATES DISTRICT JUDGE